**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| ROSA CASTILLO, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | |
| | § | |
| MERRICK B. GARLAND, Attorney General, | § | |
| Department of Justice, | § | JURY DEMANDED |
| Defendant. | § | |
| | § | |

**COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff ROSA "ROSIE" CASTILLO, in the above numbered and entitled case, complains of MERRICK B. GARLAND, ATTORNEY GENERAL AND HEAD OF THE UNITED STATES DEPARTMENT OF JUSTICE (DOJ). (Hereafter, "Defendant", "Agency", "DOJ", "USAO-SDTX" and/or "Agency"), Defendant in the above numbered and entitled case, and for cause(s) of action would respectfully show unto the Court and jury as follows:

**I. PARTIES**

1.      Plaintiff ROSA CASTILLO (Hereafter "Mrs. Castillo" or "Plaintiff") is a citizen of the United States, who was employed as a Human Resources Assistant (GS-0203-07 Step 2), by the DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE SOUTHERN DISTRICT OF TEXAS (USAO-SDTX) at the Agency's headquarters in Houston, Texas, during the time period wherein the present of cause of action accrued. Mrs. Rosa Castillo was officially employed by the Department of Justice, U.S. Attorney's Office for the Southern District of Texas ("USAO-SDTX") from on or about June 7, 2020, to on or about October 28, 2022. Plaintiff Mrs. Rosa Castillo is a

1

citizen of the United States, who was employed as a Human Resources Assistant (GS-0203-07 Step 2), by the DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE SOUTHERN DISTRICT OF TEXAS (USAO-SDTX) at the Agency's headquarters in Houston, Texas, during the time period wherein the present of cause of action accrued.

Mrs. Castillo was a federal employee within the meaning of The Americans with Disabilities Act of 1990 (ADA), The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. §12101, *et seq.*, 29 C.F.R. 1614.203(b) 2008, the Rehabilitation Act of 1973, as amended, at 29 U.S.C. §794 (the "Rehabilitation Act"), 29 U.S.C. §701-7961 (2006) and at all relevant times was a federal employee. Mrs. Castillo is a resident of the city of Humble, Harris County Texas.

2.      Defendant MERRICK B. GARLAND is the ATTORNEY GENERAL OF THE UNITED STATES AND HEAD OF THE DEPARTMENT OF JUSTICE, which is an agency of the United States government. Defendant does business at the United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001. Defendant MERRICK B. GARLAND is sued in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES AND HEAD OF THE DEPARTMENT OF JUSTICE, and as such, is amenable to suit as provided in The Americans with Disabilities Act of 1990 (ADA), The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. §12101, *et seq.*, 29 C.F.R. 1614.203(b) 2008, the Rehabilitation Act of 1973, as amended, at 29 U.S.C. §794 (the "Rehabilitation Act"), 29 U.S.C. §701-7961 (2006), and may be served by serving Attorney General, MERRICK B. GARLAND.

## II. JURISDICTION

3.     This action arises under in The Americans with Disabilities Act of 1990 (ADA), The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. §12101, *et seq.*, 29 C.F.R. 1614.203(b) 2008, and the Rehabilitation Act of 1973, as amended, at 29 U.S.C. §794 (the "Rehabilitation Act"), 29 U.S.C. §701-7961 (2006), and 28 U.S.C. Section 1346.

4.     All of the necessary administrative prerequisites have been met prior to filing the instant action, as Plaintiff has filed timely complaints of disability discrimination, race discrimination, color discrimination, and retaliation with her federal employer, the U.S. Department of State, and brings her claims more than 180 days after she filed her formal complaints. Said complaints were given the following identifiers: "EEOC Case No. 450-2023-00175X/Agency Case No. USA-2022-000479."

5.     On or about July 26, 2024, the Defendant issued its Final Agency Decision for EEOC Case No. 450-2023-00175X/Agency Case No. USA-2022-000479, regarding claims that are identified in this federal complaint**.** The Southern District of Texas is where the actions complained of in the present case took place and where the employment records relevant to the unlawful practices are kept.

6.     The jurisdiction of the Court is invoked pursuant to 28 US.C. § 1343(a)(4), Section 504 of the Rehabilitation Act of 1973.

## III. VENUE

7.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391, because the Defendant resides in this judicial district, and a substantial part of the events giving rise to this action took place within this judicial district.

## FACTS

8.    Mrs. Castillo initially started working at the Agency as a Records Examiner Contractor for the Asset Forfeiture Unit for the USAO-SDTX on or about October 12, 2017. During her tenure with the Asset Forfeiture Unit, Mrs. Castillo was recognized for her hard work, dedication, and commitment.

9.    On or about June 7, 2020, Mrs. Castillo was hired by former Human Resources Officer (HRO), Melissa Vaughan as a permanent federal government employee working for the Agency, as a Security Assistant conducting background investigations in the Human Resources Office (HR) of the USAO-SDTX.

10.    Mrs. Castillo started working in the HR Office during the Covid-19 pandemic with limited network access and little help from department management officials. Two weeks later from June 7, 2020, Mrs. Castillo's hiring manager resigned from her position as Human Resources Officer (HRO). Ms. Vaughan who had been the Agency's HRO for many years, confided in Mrs. Castillo and several other employees that the reason she resigned was due to the newly appointed Deputy, Administrative Officer Jack E. Pascoe Jr aka "Butch".

11.    Mrs. Castillo was promoted again on or about June 6, 2021, to the position of Human Resources Assistant (GS-0203-07) for the USAO-SDTX, by Acting HRO, Christine Sienkowski.

12.    Mrs. Castillo, a well-liked figure among her colleagues, close friends, family, and was known for her affable and cheerful disposition. Accordingly, when she was considering accepting a new role within the Agency's HR Office, several agency employees and contractors approached her to offer their counsel against leaving her position with the Asset Forfeiture Unit.

13.    Every HR Office is responsible for more than just hiring and onboarding employees. The HR Offices of the Agency are supposed afford its employees with a workplace where employees should feel safe reporting issues or requesting assistance. Ensuring that policies and procedures are followed

while also fostering a positive and compassionate workplace culture, particularly for individuals with disabilities, is a crucial HR responsibility. However, in the case of Ms. Castillo, the Agency's failure to fulfill its responsibilities and hold management officials accountable for their actions stands out.

14. The Agency has been grappling with employee retention challenges for several years. Despite these difficulties, Mrs. Castillo maintained an optimistic outlook, believing that the HR department was responsible for ensuring the safety and well-being of employees.

15. Mr. Jack "Butch" Pascoe ("Mr. Pascoe") joined USAO-SDTX as a high-ranking management official in on or about the year 2018. As the Agency's Deputy, Administrative Officer, Mr. Pascoe supervised all Administrative Division Section Supervisors (Human Resources, Finance, Acquisitions, IT, and Support Services) and advised the supervisors and staff in each of those sections so as to provide regulatory and necessary support to the district. Furthermore, Mr. Pascoe serves as a confidential advisor to all levels of management on a wide variety of subjects. In addition to Mr. Pascoe's duties as Deputy, Administrative Officer, he also took on the role as Acting HR Officer when Ms. Vaughan resigned.

16. Without a permanent Human Resources Officer to effectively lead and address the needs of HR personnel, Mrs. Castillo, experienced a sense of being overworked and heightened stress. At this juncture, Mrs. Castillo remained unaware that her mental, emotional, and physical well-being were now severely compromised.

17. Mr. Pascoe's conduct towards Mrs. Castillo swiftly revealed his retaliatory and hostile leadership style towards her, which was very challenging to work under. Mr. Pascoe demanded absolute subordination from Ms. Castillo.

18. Mr. Pascoe's autocratic management approach towards Ms. Castillo and his position as a high-ranking management official instilled fear of retaliation in Ms. Castillo and most employees in the

Administrative Division, which includes the HR Office, who are hesitant to express their opinions due to the very real fear of being subject to being retaliated against by Mr. Pascoe.

19.    Despite Mrs. Castillo's efforts to exceed Mr. Pascoe's expectations and earn his approval, his demeanor towards her changed shortly after he became aware of her medical condition(s) on or about October 2021.

**Mrs. Castillo Has a Record of Being a Person with a disability.**

20.    In 2017, Mrs. Castillo was diagnosed with Post Traumatic Stress Disorder (PTSD), Major Depressive Disorder, and Attention Deficit/Hyperactivity Disorder (ADHD).

21.    Despite Mrs. Castillo's career advancement, her mental health was increasingly stressed during the COVID-19 pandemic. The pandemic had a massive impact on the mental health of the public, with the CDC estimating that approximately 26% of the general population was experiencing trauma-related symptoms in 2020. For people like Mrs. Castillo, who entered the pandemic with pre-existing PTSD, the uncertainty, loss of control, and scope of suffering reactivated pre-existing trauma changes in the brain and body had a significant effect on Mrs. Castillo.

22.    Furthermore, Ms. Castillo has a secondary diagnosis of attention-deficit hyperactivity disorder (ADHD), a condition which impairs the brain's ability to differentiate important vs. extraneous information and maintain focus on the important items. Because of this, secondary pandemic changes such as the 100% work-from-home policy implemented by her office, had a great effect on Mrs. Castillo.

23.    Mrs. Castillo's previous in-office structured environment and schedule had supported her ability to mentally organize and prioritize tasks in a focused setting; during COVID, she was left in a poorly-defined shared work/living space with limited in-person communication.

24.    PTSD has been described as clear, persistent changes to a person's biological mental and physical stress pathways following severe trauma.  Mrs. Castillo has a long history of extensive lifetime

trauma, including neglect, deprivation, physical abuse, homelessness, repeated CPS involvement, and foster care placement when she was 5 and again at 9.

25.     Mrs. Castillo was just 20 years old when she became a single mother of two children. Mrs. Castillo worked as a full-time 911 dispatcher, and also went to college part-time. Working at her local Police Department changed her perspective on life. Mrs. Castillo worked hard to build something she and her family could be proud of. Her dream was to provide a better future for her children.

26.     In 2015, Mrs. Castillo married and became an active-duty military spouse.

27.     In 2016, her husband received a Permanent Change of Station (PCS) orders and moved to a new duty station in Houston, Texas.

28.     Upon joining the Agency as an employee, Mrs. Castillo brought over 18 years of distinguished work experience to the organization. Mrs. Castillo's professional achievements provided her with a profound sense of accomplishment, security, independence, pride, and motivation, enabling her to persevere despite all odds.

29.     Mrs. Castillo's lifetime history of trauma, are provided to comprehensively assess and understand the extent of the harm she has sustained as a result of the Agency's adverse discriminatory, hostile and retaliatory actions.

**The Agency's disregard of standard policy, requiring Mrs. Castillo to travel around Texas to meet in-person with employees during the pandemic (Covid-19), was extremely anxiety provoking for Ms. Castillo.**

30.     In April 2021, Mr. Pascoe and Ms. Sienkowski, asked Mrs. Castillo to complete in-person fingerprinting for all hires since the beginning of the pandemic. This was in opposition to the COVID-19 100% telework order in effect by the district due to the elevated risk levels at the time.

31.     The Agency's disregard for standard policy and/or government order, which required Mrs. Castillo's to travel around Texas to meet in-person with employees, was highly distressing and anxiety

provoking. Mrs. Castillo, out the fear of retaliation, did not question or challenge the task due to still being on a one-year probationary period as a new federal employee.

32.     Retired U.S. Navy Chief Gilberto Castillo, who is Mrs. Castillo's husband, reported that she exhibited a significant (negative) change in her demeanor upon her return home from this work assignment. Mr. Castillo specifically stated, "this was not the woman I married. I have never seen her this sick (mentally or physically)."

33.     In the context of pandemic fear and work disruption, Mrs. Castillo began to experience escalating symptoms of her PTSD. She reported to her treating physician insomnia, heart pounding, headaches, pacing, worrying, and difficulty "turning off" worried thoughts. At this time, Mrs. Castillo began to have more anxiety about her work performance and making errors.

34.     Because of the severity of her depression and lack of improvement despite maximum medication treatment, Mrs. Castillo's doctor felt she needed to begin trauma-focused psychotherapy. These programs allow participants to spend several hours a day, a few days per week, engaged in individual and group therapies.

35.     Due to the time requirement of the treatment, Mrs. Castillo's doctor completed FMLA Medical Certification paperwork, on October 5, 2021, requesting 1-3 days/week for Mrs. Castillo to attend the therapy. In said certification paperwork, Ms. Castillo's doctor specifically stated, "Mrs. Rosa M. Castillo is an individual with a mental health condition covered by the Americans with Disabilities Act (ADA)." To be clear the information provided by Mrs. Castillo's FMLA Medical Certification paperwork was a reasonable accommodation request under the Rehabilitation Act.

36.     It is imperative to acknowledge that Mrs. Castillo received the FMLA form (WH-380-E) via e-mail from HR Specialist, Ivy Wilson, several weeks earlier. This form was provided due to her recent indisposition and her request for guidance on requesting FMLA leave; however, all she received from Ms.

Wilson, who is the HR representative responsible for handling such requests, was just a form (WH-380-E). No other FMLA guidance or instructions were provided.

**From October 11, 2021 – January 18, 2022, management officials delayed approving Mrs. Castillo's reasonable accommodation request for leave under the Family and Medical Leave Act (FMLA) which violated the Rehabilitation Act.**

37.    The genesis of the hostilities against Mrs. Castillo began on October 6, 2021, when she submitted a Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act (FMLA) Form WH-380-E to request Reasonable Accommodation (RA) under FMLA on an intermittent basis.

38.    Mrs. Castillo submitted completed FMLA Form WH-380-E via work e-mail to HR Specialist, Doriane Lewis and HR Specialist, Ivy Wilson. Mrs. Castillo then received a response from Ms. Lewis that read, "Received. I will take care of it since Ivy is out."

39.    HR Specialist Ivy Wilson is the timekeeper for the HR office and is responsible for processing requests of this nature.

40.    Ms. Lewis also forwarded the e-mail to Mr. Pascoe and then five to ten minutes later, Mr. Pascoe called Mrs. Castillo, asking for supporting documentation to approve the FMLA leave reasonable accommodation request.

41.    Mr. Pascoe stated he needed a letter from Mrs. Castillo's doctor stating a diagnosis and prognosis. Mr. Pascoe also reassured Mrs. Castillo that he would properly file her medical documentation.

42.    Mr. Pascoe later confirmed in his sworn statement (dated February 10, 2023) that he did not properly file Mrs. Castillo's medical documentation, as he said he would and should have done according to procedures. Mr. Pascoe stated in said sworn statement, "Ms. Castillo provided the documentation to me and it still resides only in my email." Thus, Agency Management Officials violated the Rehabilitation Act and Americans with Disabilities Act which requires employers to maintain

information regarding the medical condition and history of individuals with disabilities in separate medical files. Mr. Pascoe's demand for a diagnosis also violated FMLA and Rehabilitation Act requirements, which does not require the disclosure of a particular diagnosis.

43.     At the time, Mrs. Castillo was unaware that Mr. Pascoe's request for a diagnosis violated FMLA and Rehabilitation Act requirements, which do not mandate the disclosure of a specific diagnosis. Further, the Agency's existing policy and procedures (USAP No. 3-4.630.003 – C. Sick Leave 1. Administratively Acceptable Medical Documentation), were also in direct opposition to Mr. Pascoe's request.   Mrs. Castillo immediately set up an appointment with her doctor to schedule an appointment to have the requested medical documents prepared from her doctor.

44.     On October 11, 2021, Mrs. Castillo complied with Mr. Pascoe's demands and supplied FMLA form WH-380-E revised, along with the medical letter stating her diagnosis and prognosis: ". This is Mrs. Castillo's first reasonable accommodation request under the FMLA and Rehabilitation Act. In October 2021, Mrs. Castillo only had the following medical diagnosis: PTSD, Major depressive disorder, and ADHD. Mrs. Castillo's medical letter stated that she was compliant with all recommended care since 2017. And that her clinical course was stable and she responded well to treatment for years; however, in 2021, in context of the COVID pandemic and all its changes to work, home, and societal life, symptoms had worsened. The Anticipated prognosis remained good, particularly if Mrs. Castillo was able to pursue the intensive therapy program (IOP) the doctor recommended and continued with medications.

**Employers have an obligation to provide employees information about their FMLA rights, responsibilities and requirements.**

45.     It's also an Agency requirement for employees to invoke their FMLA rights in WebTA (the agency's employee time and attendance software system) after submitting FMLA requests and receiving HR approval to do so. Moreover, according to 5 U.S.C. Section 630.1203 Leave entitlement: (b) An

employee must invoke his or her entitlement to family and medical leave under paragraph (a) of this section, subject to the notification and medical certification requirements in 5 U.S.C. Section 630.1207 and 5 U.S.C. Section 630.1208. An employee may not retroactively invoke his or her entitlement to family and medical leave.

46.　　The Agency's WebTA system is how employees submit time off requests, such as, personal time off, regular sick leave, and or FMLA sick leave.

47.　　Proper utilization of the WebTA system is required by the Agency so every employee can effectively track time off requests and leave balances; especially not to go over allotted FMLA sick hours. However, Mr. Pascoe stated the following in his sworn statement, "I also verbally advised her that since her request was for intermittent leave that she should continue to let me know when she needed leave or to delay her start time as she had been doing prior to submission of her FMLA Request."

48.　　According to Agency procedure, the information Mr. Pascoe claims he disclosed to Mrs. Castillo in October 2021, when she submitted her initial reasonable accommodation request under the FMLA and Rehabilitation Act, deviated from the standard procedure and constituted inaccurate information.

49.　　HR Specialist Doriane Lewis sent Mr. Pascoe messages to remind him that Mrs. Castillo needed to be advised to invoke her rights in WebTA; however, despite repeated reminders Mr. Pascoe still failed to inform Mrs. Castillo of Agency procedures regarding invoking rights and submitting leave requests under the FMLA and Rehabilitation Act.

50.　　Mr. Pascoe, refused to approve and or timely process Mrs. Castillo's reasonable accommodation request for intermittent leave under FMLA/Rehabilitation Act and then failed to provide her with the necessary information about her FMLA rights, responsibilities, and Agency requirements because he does not support mental health as a valid use of leave as a form of reasonable accommodation.

51. When Mr. Pascoe neglected to inform Mrs. Castillo of her FMLA rights, responsibilities, and Agency WebTA obligations, he sabotaged this process and obstructed her ability to take FMLA leave, he violated the Rehabilitation Act.

52. By January 4, 2022, Mr. Pascoe continued refusal to grant Mrs. Castillo's FMLA leave that she had requested as a reasonable accommodation back in October of 2021, persisted.

53. On or about January 2022, Mrs. Castillo also received her annual performance work plan (PWP) review and was surprised to see Mr. Pascoe as the assigned rater because he had not been in charge of overseeing her work for that rating period. For this rating period, Mrs. Castillo reported to Ms. Sienkowski. Therefore, she expected Ms. Sienkowski to be her assigned rater but she wasn't.

54. Amidst and despite her health challenges, Mrs. Castillo intensified her efforts to manage the Agency's background investigations security program. She also trained new hires, contributed to various department projects, and assumed the responsibilities of her newly appointed position as an HR Assistant.

55. Mrs. Castillo dedicated a significant portion of her leisure time to meticulously reviewing and rechecking her work prior to submission to ensure the absence of any minor errors. Having observed the treatment accorded to other employees who encountered mistakes or expressed dissent with Agency Management Officials, she harbored apprehensions about potential negative repercussions.

56. Upon review of her PWP, Mrs. Castillo saw that Mr. Pascoe had given her a lower rating (element #5 complies with policies/procedures and contributes to a positive work environment) than what she deserved.

57. Mrs. Castillo also noticed that from one day to another the two new HR Assistants she trained in security stopped following her security training /guidance. Mrs. Castillo later confirmed that Mr. Pascoe went behind her back and instructed the new HR Assistants to not follow her security training.

58.     Because Ms. Lewis had recently been promoted by Mr. Pascoe to the position of HR Officer, Mrs. Castillo advised Ms. Lewis that she was not in agreement with Mr. Pascoe's assessment of her work. It was unfair. Ms. Lewis agreed.

59.     On or about January 14, 2022**,** Mrs. Castillo had a meeting with Mr. Pascoe and asked him to reconsider and change the rating he gave her to outstanding. Mr. Pascoe refused. He then stated that he rarely gave employees with less than 3 years on the job outstandings. This is false and pretext for discrimination, disparate treatment and retaliation. Because Mr. Pascoe gave Mrs. Castillo two (2) outstandings on her performance review the previous year, prior to his knowledge of Mrs. Castillo's disabilities and reasonable accommodation requests, with Mrs. Castillo only one year on the job.

60.     Moreover, Mr. Pascoe gave Shenedria Mills-Randall, a newly hired HR Assistant, who Mrs. Castillo had carefully trained, an outstanding rating that he refused to give Mrs. Castillo.  Mrs. Castillo began to realize that from October 2021 to January 2022, the only thing that had really changed was that Mr. Pascoe knew her medical diagnosis/disabilities and need for reasonable accommodations. This was Mr. Pascoe's discriminatory and retaliatory animus against Mrs. Castillo.

61.     When Mrs. Castillo asked Mr. Pascoe what she could do better to earn the additional outstanding again, he said that one of the things Mrs. Castillo could improve, was to not miss the weekly HR meeting because her absence is an inconvenience. Mr. Pascoe deliberately reduced Mrs. Castillo's annual performance evaluation because she missed a few HR meetings as a result of her deteriorating medical condition. During this discussion, Mrs. Castillo informed Mr. Pascoe that she occasionally missed some morning meetings because of migraine headaches related to her disability. This outcome could have been avoided had Mr. Pascoe fulfilled his job responsibilities effectively and timely approved her initial reasonable accommodation request to take leave. Penalizing Mrs. Castillo annual performance evaluation

due to her deteriorating health also contradicts what he claims he told her in October 2021, because he was now aware of her medical condition and need for reasonable accommodation.

62.     Mrs. Castillo prudently explained to Mr. Pascoe that she occasionally missed the weekly HR meeting because she was suffering from bad headaches due to her disability. She also explained how she used her Gliding Schedule for the flexibility (it allows employees to start at 10:00 a.m. if needed) on the mornings she struggled with her medical condition.

63.     Mrs. Castillo also reminded Mr. Pascoe that her worsened health is the reason she needed to take leave, but she didn't receive his approval. When Mrs. Castillo reminded Mr. Pascoe of this fact, he instructed her to do the following; when she does not feel well, "she should lay down and still log in when it is time for the HR meeting." Mr. Pascoe is not a medical provider and, specifically not Mrs. Castillo medical provider, and as such has no right to recommend medical treatment of Mrs. Castillo.

64.     Mrs. Castillo was profoundly affected by Mr. Pascoe's above stated response. Immediately following the conclusion of the meeting, she approached her husband who heard this conversation and cried in his embrace.

65.     On or about January 19, 2022, Mrs. Castillo reached out to HR Specialist Michelle Suarez and explained, again, her medical need for FMLA leave as form reasonable accommodation under the Rehabilitation Act.  Ms. Suarez is known among her colleagues as a subject matter expert in HR policies and procedures. She is also a person Mr. Pascoe could not manipulate into doing something inappropriate.

66.     Ms. Suarez quickly provided Mrs. Castillo the FMLA guidance that Mr. Pascoe had previously failed to offer. On or about January 20, 2022, Mrs. Castillo submitted via e-mail her second reasonable accommodation request for leave under FMLA (FMLA form WH-380E) and Rehabilitation Act, accompanied by appropriate medical documentation.

67.     Mrs. Castillo's sent the Agency and updated October 11, 2021 medical letter that stated the following: "a letter was provided substantiating the treatment recommendation that Ms. Castillo pursue a higher level of care at an intensive therapy program (IOP). She reports that no time off was granted for this therapy. Symptoms have continued to worsen, and at this time I recommend a 6–12-week period of continuous time off so that she able her to pursue a higher level of care (e.g. IOP) treatment and recovery."

68.     The term "a period of continuous time off" is basic medical language found in <u>all</u> Medical Certifications (FMLA form WH-380-E). The language employed here clarifies to employers that the medical time off required is not intermittent but continuous. Mr. Pascoe and Ms. Lewis intentionally misinterpreted this definition and exploited it as a pretext for further discrimination and retaliation against Mrs. Castillo.

69.      Mrs. Castillo's January 20, 2022, email to Ms. Lewis and Mr. Pascoe also included detailed information about Mr. Pascoe's failure to approve her first reasonable accommodation request for leave under the FMLA and Rehabilitation Act. Mrs. Castillo's e-mail to Ms. Lewis and Mr. Pascoe stated the following: "I (Rosa Castillo) originally submitted a FMLA request on <u>10/06/2021</u>. This request included medical documentation, as well as detailed my need to intermittently take leave. I was advised that the request would be "taken care of" but I did not receive any additional guidance or instruction…. In HR we truly work hard to help and meet every employee need for support, resource, and information. We make sure to follow-up on every request and meet every deadline for personnel actions, however, I was not provided the same level of care and service… I am now submitting a new FMLA request and hope it is processed accordingly, so I may take the required time for treatment and recovery."

70.     Mrs. Castillo's e-mail triggered almost instant retaliation from Mr. Pascoe. Ms. Lewis promptly contacted Mrs. Castillo upon receiving the aforementioned e-mail with her second reasonable accommodation request for leave under FMLA and Rehabilitation Act, accompanied by appropriate

medical documentation. Ms. Lewis' initial statement was that Mr. Pascoe was her supervisor on October 11, 2021, and therefore, it was his responsibility to approve Mrs. Castillo's FMLA leave request—not Ms. Lewis. Ms. Lewis also informed Mrs. Castillo that since she had assumed the role of HR Officer, she would ensure the timely processing of Mrs. Castillo's FMLA paperwork.

71.    Mrs. Castillo had to wait over 100 days to begin required medical treatment. Had the Agency timely granted leave as a reasonable accommodation when Mrs. Castillo asked for it, then it would not have forced Mrs. Castillo into a worsening mental health situation. Had Ms. Castillo been timely granted leave as a reasonable accommodation, she could have quickly recovered and continued providing service without absence. As a result of the Agency's intentional inaction, Mrs. Castillo's health worsened dramatically and her symptoms continued to be severe to the point that she eventually filed for Worker's Compensation due to a Work-Related Traumatic Injury stemming from Pascoe's stubborn refusal to provide FMLA leave as reasonable accommodation for over 100 days.

72.    It is also crucial to emphasize that Ms. Lewis did not adhere to Mr. Pascoe's initial discriminatory and retaliatory example. As Ms. Lewis did not request that Mrs. Castillo provide a medical letter detailing her diagnosis and prognosis in order to process her FMLA reasonable accommodation request.

73.    Additionally, Ms. Lewis and Mrs. Castillo engaged in a discussion regarding Mrs. Castillo's workload, tasks, and pending assignments. Ms. Lewis subsequently then reduced the workload for Mrs. Castillo from January 20, 2022, to February 3, 2022. Furthermore, Ms. Lewis requested that Ms. Castillo refrain from accepting any additional requests to facilitate the prioritization of closing pending tasks.

74.    Mrs. Castillo did not request the above accommodation as she did not know this was available to her. Ms. Lewis decision to place Mrs. Castillo on a reduced workload for two weeks before

her scheduled FMLA leave is evidence that the HR office was capable of providing this type of accommodation but only chose to do so when they wanted to, not when it was necessary for Ms. Castillo.

75.     Ms. Lewis subsequently clarified that Mrs. Castillo was not obligated to complete all elements of her job description prior to her FMLA leave because she was still considered a new HR Assistant and was still acquiring additional HR responsibilities. However, when it was time for Mrs. Castillo to return from her FMLA leave on or about May 2022, Agency Management Officials declined to grant her reasonable accommodation request for a reduced workload for a period of only three weeks. This was done to discriminate against Ms. Castillo because of her disabilities and in reprisal against Mrs. Castillo for disclosing her disabilities, requesting reasonable accommodations and for having engaged in protected EEO activity in March 2022.

76.     On or about January 25, 2022, Mr. Pascoe held a meeting with Mrs. Castillo and invited former Contract Supervisor Pamela Morgan (3rd party) to attend this meeting. Ms. Morgan was not Mrs. Castillo's supervisor, nor had she ever supervised her before. Mr. Pascoe did not give Mrs. Castillo an opportunity to have an individual of her choosing present at this meeting. Mr. Pascoe initiated this meeting by asking Mrs. Castillo to repeat exactly what she heard him tell her on January 14, 2022, when he instructed her to lay down and still log in when it is time for the HR meeting.  Mrs. Castillo immediately felt ambushed and intimidated by the way Mr. Pascoe was interrogating her in front of Ms.  Morgan. Ms. Castillo was compelled to verbally repeat the exact words he had spoken to her. Moreover, she reiterated that her absence from a few HR meetings was solely due to an escalation in her migraine frequency, exacerbated by her deteriorating medical condition. Mr. Pascoe dismissed the entire incident as a misunderstanding. And when Mrs. Castillo inquired about the status of the reasonable accommodation request under the FMLA and Rehabilitation Act for intermittent leave that she had submitted for his

approval on October 2021, he responded with a shoulder shrug and said that she could have utilized regular sick leave instead.

77. HR Specialist Michelle Suarez stated the following in her sworn witness statement regarding Mrs. Castillo's request for leave under FMLA, based on her observations of Mr. Pascoe's behavior towards Ms. Castillo's coworkers, it was treated/processed differently from similar requests made by other employees at the Agency, "The delay from October to January would not be tolerated for any other employee under any circumstances." The Agency did not discipline him for his actions against Mrs. Castillo—instead they rewarded his actions with a promotion.

**In February 3, 2022, management denied Ms. Castillo her request to use her government furnished laptop while on approved leave**.

78. Mrs. Castillo's request for reasonable accommodation request, for FMLA leave to complete medical treatment, submitted on October 2021, was ignored, and her need for treatment explicitly belittled in her discussions with Mr. Pascoe thereafter. Once Ms. Castillo's leave was finally approved, she was held to new and undocumented protocols for her leave, including being forced to surrender her work laptop on February 3, 2022, despite the confirmation by IT Specialist Jermaine Salazar that this was not standard or expected policy for employees out on approved FMLA leave.

79. Several things happened that changed the course of Mrs. Castillo's medical treatment and overall health. For the duration of the COVID-19 pandemic, which spanned nearly two (2) years, Mrs. Castillo and all other Agency employees were required to work 100 % remotely. Consequently, employees were expected to maintain access to their work laptops at all times, even during approved leave.

80. On or about February 3, 2022, Mrs. Castillo was held to new and undocumented protocols. She was asked to leave her assigned employee laptop at work before leaving at the end of the day. Mrs. Castillo found the timing of this request to be highly unusual. Therefore, she inquired with IT Specialist,

Jermaine Salazar whether any USAO-SDTX Management Official had issued a policy or guidance to all district employees, advising that this was now a mandatory requirement for all employees taking leave.

81.     Mr. Salazar promptly denied the existence of any such policy or guidance directed to Agency employees. Given Mrs. Castillo's well-deserved reputation as a diligent and reliable employee, Mr. Salazar inquired with the IT Supervisor, Mr. Duane Powlett, regarding Mrs. Castillo's request to retain her work laptop during her approved leave. Mr. Salazar confirmed that Mr. Powlett granted Mrs. Castillo's request. Upon receiving approval, Mrs. Castillo promptly texted Ms. Lewis to convey this information and confirm it was also okay with her. Ms. Lewis responded, requesting that Mrs. Castillo forward the information via email. Mrs. Castillo complied with her demand but anticipated that Ms. Lewis would forward the email to Mr. Pascoe, thereby providing him with an additional pretext to seize her laptop.

82.     Regrettably, Mrs. Castillo's suspicions were once again substantiated. Ms. Lewis responded to Mrs. Castillo's email, saying that because she truly cares about Ms. Castillo's health and well-being, she had decided Mrs. Castillo still needed to leave her laptop at work for the duration of her leave. This incident was extremely traumatizing for Mrs. Castillo, to the point that she was forced to file for Worker's Compensation due a Work-Related Traumatic Injury stemming from Pascoe's stubborn refusal to provide FMLA leave as a reasonable accommodation for over 100 days, and the unprecedented and discriminatory removal of her laptop.

83.      Several notes from Mrs. Castillo's mental health provider show that she recalls closing her work laptop and making a slow, somber return to her car while shedding tears. Mrs. Castillo wept uncontrollably and continuously for the entire hour it took her to reach home.

84.     To further complicate the situation, sometime after this incident, Mrs. Castillo was contacted by Rachel Bartenfeld, a former paralegal with USAO-SDTX, who confirmed she was permitted to retain her assigned work laptop for a few weeks ("a period of continuous time off") while out on FMLA

leave (May-June 2023 estimate). Ms. Bartenfeld later resigned from her position with the Agency. Ms. Bartenfeld said leaving USAO-SDTX was the best thing she ever did. "It is a toxic work environment and once you get away from it—you truly see it."

85.     Ms. Bartenfeld was a GS federal employee just like Mrs. Castillo and with similar work duties and responsibilities but Mr. Pascoe and Ms. Lewis refused to allow Mrs. Castillo to keep her assigned work laptop while out on approved FMLA leave.

86.     This incident, along with the many other incidents mentioned here, further corroborates that Agency Management Officials singled out Mrs. Castillo from the outset and continued to subject her to a discriminatory and retaliatory hostile work environment by confiscating her laptop due to her concerns about the discriminatory actions against her.

87.     Mrs. Castillo also named IT Specialist Jermaine Salazar and IT Supervisor Duane Powlett as witnesses in this matter. However, despite their direct involvement in this incident, the Agency did not interview them. Early in the investigation process the Agency exhibited significant shortcomings and an intentional lack of transparency. The primary objective of the Agency was not to protect Mrs. Castillo, who experienced disability discrimination and retaliation, but instead rather to protect Mr. Pascoe, a high-ranking management official.

88.     Agency Management Officials subsequently agreed to provide Mrs. Castillo with a RSA token to access her employers network several weeks after the incident mentioned above occurred. However, this resolution was only proposed by Ms. Lewis after Mrs. Castillo had filed her EEO complaint and expressed concerns about the matter in multiple emails.

89.     While the Agency's decision to grant Mrs. Castillo a hard token; which she was unable to collect due to her deteriorating medical condition, was noted, it does not imply that the distress she endured is inconsequential. Despite the psychological and emotional harm inflicted, the Agency remained

unwilling to acknowledge its culpability. Offering to give Mrs. Castillo a RSA token after the fact only proved Mrs. Castillo's point. For two years Agency personnel worked 100% remotely due to Covid-19. Employees were never instructed to drop off laptops when out on approved leave for any reason but when Mrs. Castillo spoke up about discrimination all of a sudden she was forced to turn in her laptop. The timing of Management Officials' decision to remove Mrs. Castillo's assigned laptop only serves to confirm their abuse of authority and the intentional nature of their discriminatory and retaliatory animus against Mrs. Castillo. Mr. Pascoe and Ms. Lewis simply fabricated excuses to conceal their true pretextual intentions.

90.     The hostile manner in which Mrs. Castillo was treated by Agency Management Officials exacerbated her mental anguish and disabilities. Consequently, Mrs. Castillo experienced significant psychological damage.

91.     Once Mrs. Castillo realized she was being treated differently, she tried to consistently raise her concerns with the Agency whenever they exhibited discriminatory or retaliatory behavior but it only made matters worse for her.

92.     On or about February 11, 2022, Mrs. Castillo contacted the Employee Assistance Program (EPA) for counseling. Mrs. Castillo had several therapy sessions with Mr. Michael Roots and was referred by him to pursue long-term therapy and support for current and previous behavioral health concerns, some of which had been exacerbated by the work circumstances at that time.

93.     On or about February 24, 2022, Ms. Lewis advised that she completed the USA Bank Application for Mrs. Castillo through USA Forms – she advised that Mrs. Castillo was approved for 95.75 leave bank hours.

94.      On or about March 01, 2022, after several failed attempts to file EEO complaint online, Mrs. Castillo called the EEO Office. She explained to the intake staff member Dawn Belton that she was trying to file a complaint online but had been unsuccessful. Ms. Belton quickly confirmed that the reason

Mrs. Castillo could not file the EEO complaint online was because she did not have her work laptop. Federal government employees may file EEO complaints online exclusively through their Agency's network.

95.     Mrs. Castillo promptly recognized the reasons behind Ms. Lewis and Mr. Pascoe's unwavering resolve to keep her laptop.  Mr. Pascoe was aware that Mrs. Castillo had numerous valid reasons to file an Equal Employment Opportunity (EEO) complaint. Consequently, he and Ms. Lewis attempted to discourage her from doing so by taking away her laptop.

96.     On or about March 3, 2022, Mrs. Castillo emailed Ms. Lewis to advise her that she was going to complete a full 12 weeks of FMLA. Ms. Castillo's FMLA/USAbank hours had her covered through April 29, 2022, with a return-to-work date of Monday, May 2, 2022.

97.     On or about April 14, 2022, Mrs. Castillo emailed Ms. Lewis asking for an extension of her FMLA leave until May 27, 2022, which amounts another attempt of Ms. Castillo to request reasonable accommodations. Ms. Lewis replied that Mrs. Castillo was to return to work on May 2, 2022, or request leave using any leave balance or Leave Without Pay (LWOP).

98.     On or about April 21, 2022, Mrs. Castillo complied and sent Ms. Lewis a letter from her doctor requesting two weeks of LWOP. The medical letter stated the following: "Mrs. Castillo was evaluated in my office today for follow-up on her medical condition… Due to Ms. Castillo's serious health condition, it is medically necessary for the employee to be absent from work for the next 3 weeks to permit additional treatment and recovery. I expect Mrs. Castillo to return to work on 05.16.22, if there are no further complications."

99.     On or about April 22, 2022, Ms. Lewis emailed Ms. Castillo a Vacancy Announcement for an Administrative Services Specialist position out of the blue and to Ms. Castillo's surprise. Receiving this email from her direct supervisor made Mrs. Castillo feel devastated, especially as she had just started

going through the EEO informal counseling stage – it only confirmed that Ms. Lewis and Mr. Pascoe wanted Mrs. Castillo out of the HR department – this was one of the major actions that would eventually compel Mrs. Castillo to initially tender her resignation, as she felt constructively discharged from her workplace due to these discriminatory behaviors.

100.    On or about April 27, 2022, Ms. Lewis replied to Ms. Castillo's LWOP request by stating that HR would enter a sick leave LWOP request in WebTA for May 2, 2022, through May 13, 2022 while waiting on leave bank approval. The return-to-work date was moved to May 17, 2022.

101.    On or about April 28, 2022**,** Mrs. Castillo requested further instructions for providing for reasonable accommodations. Concurrent to this request, Mrs. Castillo tendered her resignation in an email, with her last day of work as June 10, 2022. Mrs. Castillo requested this a reasonable accommodation form in advance because she could not return to work on May 17, 2022, without reasonable accommodations for light-duty.  She received the form from Ms. Lewis without instructions, so she completed the form to the best of her knowledge.

102.    On or about May 02, 2022**,** Mrs. Castillo submitted to Agency Management Officials the her reasonable accommodation request to return to work on light-duty (reduced workload) from May 16, 2022, through June 10, 2022.

**Mrs. Castillo suffered retaliation due to her protected EEO Activity, including but not limited to, on May 16, 2022, Agency Management Officials denied Mrs. Castillo's request for reasonable accommodation in the form of a reduced workload.**

103.    On or about May 16, 2022, Agency Management Officials denied Mrs. Castillo's request for reasonable accommodation in the form of a reduced workload.

104.    A crucial meeting had occurred on May 11, 2022, wherein Mrs. Castillo participated in EEO informal counseling/mediation on a WebEx meeting and to discuss USAO-SDTX management response to her requested resolution. During this meeting, management made a settlement offer. Ms.

Castillo confirmed that she did not feel comfortable dropping her EEO pre-complaint and intended to proceed with EEO formal complaint.

105.    On or about May 13, 2022, Mrs. Castillo again informed the Agency that she declined to settle her legal claims and that she was going to file a formal EEO complaint. It should be noted that retaliation for EEO mediation activity is a protected basis acknowledged by the EEOC.

106.    Additionally, requesting reasonable accommodations constitutes protected EEO activity–according, all of Ms. Castillo's reasonable accommodation requests, including her reasonable accommodation requests on her FMLA leave documents, further constitute prior protected EEO activity for which the Agency retaliated against Mrs. Castillo.

107.    By on or about May 12, 2022, eleven days had already passed since Mrs. Castillo submitted her reasonable accommodation documentation to initiate the reasonable accommodation interactive process. However, Ms. Walker did not contact Mrs. Castillo regarding her reasonable accommodation request to return to work on light-duty basis until after EEO mediation did not resolve in settlement.

108.    In retaliation, EAUSA, Krystal Walker commenced the process to deny Mrs. Castillo's reasonable accommodation request to return to work on light-duty, which itself is a failure to accommodate.

109.    Ms. Walker sent the following e-mail to Mrs. Castillo, stating the follow, "I am following up on your DOJ Form 100A Request for Reasonable Accommodation. Because your responses on the form do not identity your medical condition in any way, or the way(s) in which it may impact your ability to perform your job functions, I am unable to make an informed decision on the request at this time. Please have the medical provider, who is treating you for the condition upon which your request is based, complete the attached form and return to me within 5 days".

110.     On or about May 13, 2022, Mrs. Castillo provided Dr. Patel's response to the Agency at 10:21 a.m. At 1:08 p.m., Mrs. Castillo confirmed, once again, that she had already decided to proceed with formal a EEO complaint. Immediately, at 3:01 p.m., Ms. Walker retaliated – stating, "Based on the medical questionnaire responses from your doctor, it does not appear that you are able to perform any critical performance element of your position." Mrs. Castillo replied, "yes, ma'am. However, I am able to perform one task or project at a time without hard deadlines."  The Agency intentionally did not engage in good faith during reasonable accommodations interactive process – rather, this was a manipulative, sneaky question laced with legal implications, that at the time, Mrs. Castillo did not understand – the Agency was attempting to entrap Mrs. Castillo into saying she could not be accommodated – and this was after the protected EEO mediation, so Mrs. Castillo had no idea that now, they were trying to sabotage the process by sneakily and deceptively trying to have her state on record that she could not be accommodated.

111.     On or about May 16, 2022, Mrs. Castillo followed up with Ms. Walker a day before she was due to return to work, to ensure that she would be able to return to work on light-duty as an accommodation. The Agency was required to explore this light-duty option, especially for such a limited time as requested. It was noted that Mrs. Castillo medical letters made it clear that she had medical clearance to return to work on light-duty only, however, as soon EEO mediation did not lead to a settlement the Agency retaliated. On this day, Mrs. Castillo received a formal denial of reasonable accommodation request from Ms. Walker: "Based on the responses to the medical questionnaire and as you have acknowledged below, you can no longer perform the critical performance elements/essential functions of your Human Resources Assistant position, therefore, we are unable to grant your request for accommodation."  Again, this was upsetting and obviously discriminatory, retaliatory, and pretextual.

112.     Given that the EEO mediation did not lead to a settlement, the Agency continued its failure to accommodate, motivated by and because of disability discrimination and retaliation. The Agency cannot

show that there would have been an undue burden to accommodate Mrs. Castillo. The reasonable accommodation of the light duty request was not afforded to Ms. Castillo in retaliation for Mrs. Castillo continuing to pursue her EEO rights. This reasonable accommodation could have been granted without any undue hardship to the Agency.

113. Facing no other choice due to this refusal to provide the light duty reasonable accommodation, Mrs. Castillo requested continued Leave Without Pay (LWOP) extending until June 10, 2022. This LWOP was approved. However, after this point, Ms. Lewis – Mrs. Castillo's direct supervisor – stopped replying to her emails altogether.

**In May and June 2022, management delayed responding to her requests for assistance with completing a Voluntary Leave Transfer Program (VLTP) form.**

114. Due to Mrs. Castillo's reasonable accommodation request to return to work on light-duty being denied and her medical condition worsening—it qualified as a medical emergency and required assistance completing a second USAbank /VLTP donations application. The form required a return-to-work date, and Mrs. Castillo was uncertain of what to input. Her direct supervisor, Ms. Lewis, was unwilling to respond to her request for assistance with this specific matter.

115. On or about May 18, 2022, Mrs. Castillo was compelled to send a follow-up email to Ms. Walker, requesting her assistance with the USAbank /VLTP donations application. Mrs. Castillo sought to apply for three more weeks of USAbank /VLTP donations to support her from May 17, 2022, to June 10, 2022. However, Ms. Walker informed Mrs. Castillo that only individuals experiencing medical emergencies are eligible to apply for leave donations.

116. Mrs. Castillo promptly reminded Ms. Walker that her situation constituted a medical emergency. Ms. Walker was requested to provide any USAO policy or guidance to clarify what constitutes a medical emergency. Despite Mrs. Castillo's straightforward request for policy information on the matter,

Ms. Walker failed to provide the requested information. Therefore, Mrs. Castillo was unable to confirm or comprehend the additional adverse actions taken against her. Ms. Lewis and Ms. Walker's deliberate intentional refusal to assist an individual with a disability with policy information so that she can understand actions taken against them is unacceptable.

117. In addition, Agency Management Officials do not oversee the USAbank /VLTP program. This program is managed by EOUSA HR personnel. Consequently, by refusing to assist Mrs. Castillo with this form, they denied her the right to apply for USAbank /VLTP donations and to proceed with the vetting process.

118. Agency Management Officials not only overestimated their authority but also discriminated and retaliated against Mrs. Castillo based on her disability and protected EEO activities. They also disregarded her rights to receive a fair and impartial reasonable accommodation interactive process and prevented her from potentially receiving donations from the employee voluntary leave transfer program (VLTP). Once again, this constitutes another instance of discrimination and retaliation. Agency Management Officials took action against Mrs. Castillo immediately after the EEO mediation did not lead to a settlement.

119. On or about May 23, 2022, Mrs. Castillo rescinded her resignation. Mrs. Castillo rescinded her resignation with a message to Administrative Officer Rodney Mattix, who was Mr. Pascoe and Ms. Lewis' supervisor, given that Ms. Lewis was now refusing to reply to Mrs. Castillo's emails. Mr. Mattix also ignored Mrs. Castillo's emails.

120. On or about May 25, 2022, Mrs. Castillo filed a formal EEO complaint of discrimination (EEOC Case No. 450-2023-00175X/Agency Case No. USA-2022-000479). Mrs. Castillo came to the agonizing realization that she needed to protect herself. All the hard work she had dedicated over the years to build for her family was being destroyed right before her eyes.

121.    On or about May 31, 2022, Mrs. Castillo at 4:42pm, responded to Ms. Walker's disability questions in reference to her reasonable accommodation request for one year of leave under Leave Without Pay (LWOP). Ms. Walker asked Mrs. Castillo whether she was going to apply for disability retirement and the basis on which she was seeking it. Mrs. Castillo replied, "Yes, I am applying for disability retirement. My medical condition worsened and I've become disabled. My disability is expected to last at least one year and I am moving forward with disability application as per OPM Retirement guidelines. I have provided appropriate medical information (letters and medical questionnaire completed by my doctor) related to my disability when I applied for FMLA and function limitations where also explained by my doctor when I applied for reasonable accommodations. If the document already provided is not enough for my supervisor to complete the attached forms for my disability application, please advise what else is needed."

122.    Mrs. Castillo advised that because her reasonable accommodation request to return to work on light-duty for three weeks was denied-- she did not have medical clearance to return to work without the accommodations; therefore, needed the Agency to extend her LWOP up to one-year. Again, if Mrs. Castillo's medical condition had not been aggravated by Agency Management Officials, she would not have been required to apply for a one-year LWOP.

123.    One year of LWOP is an option available as a reasonable accommodation to employees who are not able to work due to medical reasons and provides the federal employee the opportunity to focus on the OPM Federal Employee Retirement System (FERS) disability application without having to worry about removal from federal service under a misconduct code, such as the one the Agency ultimately charged Mrs. Castillo with. Despite the HR office having a higher number of employees on staff and the approval of this request not posing an undue hardship for the Agency-- Management Officials also declined to approve this reasonable accommodation request.

124.    In retaliation for Mrs. Castillo's protected EEO activity, Agency Management Officials deliberately denied her reasonable accommodation request for one year of LWOP to force her into an absence without official leave (AWOL) status in order to be able to initiate her removal under the untrue allegation of misconduct from federal service. This is the first step in the removal process when an Agency wants to get rid of a federal employee under a misconduct code.

125.    Agency Management Officials had resolved to continue engaging in discriminatory and retaliatory actions against Mrs. Castillo due to her protected EEO activity; therefore, decided not to engage in further discussion about her medical disability. Management Officials also declined to request or review the medical documentation she continued to send them with hopes they would review and reconsider misconduct charges against her and offer a better alternative-- removal under medical inability to perform, however, they also ignored this request. Instead, the Agency endeavored to focus on destroying Mrs. Castillo's federal career and exemplary work history.

**On June 13, 2022, management placed Mrs. Castillo on absent without leave (AWOL) status despite having sufficient medical documentation to classify her removal under medical inability to perform.**

126.    On or about June 7, 2022, Mrs. Castillo was eventually provided a letter from the Agency that she would be required to return to work on Monday, June 13, 2022.

127.    On or about June 9, 2022, Ms. Castillo provided a medical letter confirming that she could not return to work as requested due to medical reasons and on June 13, 2022, the Agency placed her on AWOL status. Based on Mrs. Castillo's exemplary work history with the Agency the penalty imposed was not expected or deserved.

128.    A charge of excessive absence is upheld when an employee is in on unpaid leave status and there is no end in sight to the employee's absence. However, again, there would have been an "end in sight," had the Agency accommodated Mrs. Castillo.

129.    All efforts made by Mrs. Castillo's to provide the Agency with all the necessary medical documentation they needed to stop AWOL charges against her and issue her removal under medical inability to perform were futile. An HR personnel action she qualified for because the Agency denied her requested accommodations, citing their inability to provide any reasonable accommodations. Given that the Agency was aware that Ms. Castillo's disability was expected to persist for at least a year, the appropriate personnel action in this situation was to propose removal under medical inability to perform. However, the Agency's objective at this point was to damage Mrs. Castillo's federal employment record and remarkable work history and for this reason they chose to classify her removal under AWOL status – as a discriminatory and retaliatory action for her protected EEO activity.

130.    On or about June 10, 2022**,** Mrs. Castillo submitted a request for policy information from Agency Management Officials to gain insight into the reasons behind her placement on AWOL status. Instead of receiving a proposed removal under medical inability to perform, the Agency once again refused to provide Mrs. Castillo with any policy information for her to understand the actions taken against her and or why she did not qualify for removal under medical inability to perform.

131.    On or about June 15, 2022**,** Mrs. Castillo e-mailed Ms. Lewis as follows: "Can you please explain the reason why I have been placed on an unapproved status instead of removed due to the fact that I am medically unable to work? I do not understand this decision because I have provided medical documentation to support his personnel action…The fact that I have an EEO Complaint does not give this office the right to ignore me, or my requests for information, guidance, and assistance with records." All employers have a legal obligation to provide a person with a disability with the necessary policy information and guidance requested to comprehend the actions taken against them. However, the Agency refused, several times, to furnish the requested information to Mrs. Castillo.

132.    On or about June 17, 2022, Ms. Walker completed the Agency's Certification of Reassignment and Accommodation Efforts SF-3112D form. Ms. Walker made it a point to attach a continued response to question 4 that stated: "The purpose of a reasonable accommodation is to help an employee with a disability be able to perform his or her job. No employer/agency is required to permit an employee to not perform the essential functions of her position under the guise of a "reasonable accommodation," but still get paid as if the employee were successfully performing the essential functions of her position." Ms. Walker's comments are another an example of the retaliation Mrs. Castillo was subjected to after she EEO mediation did not result in settlement. First and foremost, Ms. Walker failed to provide Mrs. Castillo with the impartial and transparent good faith interactive process that she was legally entitled to receive as an individual with a disability. Ms. Walker was initially assigned to represent the Agency during the EEO pre-complaint stage. After EEO mediation did not resolve with settlement, Ms. Walker, along with other Agency Management Officials retaliated against Ms. Castillo.

133.    Secondly, Ms. Walker failed to engage in good faith with Mrs. Castillo during the reasonable accommodation interactive process and did not discuss Mrs. Castillo's workload and tasks with her supervisor to know she was not required to perform all elements of her job description prior to her FMLA leave. Mrs. Castillo was not required to perform all elements of her job description because she was still new to the position.

134.    Furthermore, Mrs. Castillo did not receive even one phone call from Ms. Walker to inquire about her prior duties and tasks, or to provide Ms. Castillo with an opportunity to discuss alternative reasonable accommodation solutions. In fact, Ms. Walker's emails to Mrs. Castillo were mostly condescending and demonstrated her unwillingness to provide appropriate assistance to an individual with a disability.

135.    The Agency refused to see that a conflict of interest existed from the start of the reasonable accommodation interactive process because Ms. Walker's repeated actions against Mrs. Castillo demonstrates a lack of impartiality. Ms. Walker had zero intentions of helping Mrs. Castillo from the very beginning. Her focus was to protect the Agency from Mrs. Castillo's EEO complaint and also protect Mr. Pascoe because he is a high-ranking management official.

**On June 18, 2022, management delayed Ms. Castillo's within grade increase (WGI).**

136.    Mrs. Castillo's within grade increase (WGI) was due on June 6, 2022. Mrs. Castillo received a copy of her personnel file from Ms. Lewis and realized her WGI was missing. When she asked Ms. Lewis what happened to her WGI, Ms. Lewis stated it simply had not been processed yet.

137.     Despite receiving multiple reminders from Mrs. Castillo requesting the timely processing of her WGI, Ms. Lewis failed to provide her with any information that would enable her to comprehend the reasons behind the delay in processing her WGI.

138.    All WGI's are required to be processed and ready to key 30 days prior to their due date in the HR management system; however, Mrs. Castillo WGI was delayed because the Agency wanted to keep her from receiving this personnel action. Without this WGI Mrs. Castillo could not prove that she had successfully completed her time in grade (GS-0203-07 Step 2).

139.    All WGI's are required to be processed and ready to key 30 days prior to their due date in the HR management system; however, Mrs. Castillo WGI was delayed because the Agency wanted to keep her from receiving this personnel action. Without this WGI Mrs. Castillo could not prove that she had successfully completed her time in grade (GS-0203-07 Step 2).

140.    On or about July 6, 2022, Mrs. Castillo received a comprehensive medical report from her treating psychiatrist and forwarded the documentation to Ms. Lewis, her direct supervisor, who also serves as the Agency's Human Resources Officer, received this report.

141.    A thorough examination of the medical report received by the Agency in July 2022 revealed that the documentation provided all the necessary information to comprehend Mrs. Castillo's absence from work and her inability to return without reasonable accommodations. This absence was attributed to the exacerbation of her medical condition.

142.    Regrettably, the Agency disregarded Mrs. Castillo's medical report and refused to halt the proposed removal from federal service and the charges against her for misconduct. Specifically, on October 28, 2022, she was dismissed from her position due to the allegations of Absence without Leave and Excessive Absence[1].

143.    Throughout the entire EEO pre-complaint/formal complaint process, culminating in the wrongful termination of Mrs. Castillo's federal service, Ms. Walker's primary objective was to get rid of Mrs. Castillo rather than acting as a neutral party. Instead of facilitating Mrs. Castillo's understanding of the actions against her, Ms. Walker exacerbated Ms. Castillo's confusion of the reasonable accommodation process. Furthermore, Ms. Walker and Ms. Lewis consistently denied providing Mrs. Castillo with the policy information she repeatedly requested, hindering her comprehension of the actions against her.  Mrs. Castillo has repeatedly asked about the necessity of additional medical documentation to prevent misconduct and mitigate potential misconduct charges against her because she qualified for the personnel action of removal from federal service under medical inability to perform. Again, all of Mrs. Castillo's requests were intentionally ignored motivated by and/or because of disability discrimination and protected EEO activity.

---

[1] Please note that the instant federal complaint does not include an independent claim for Ms. Castillo's unlawful removal from federal service at this time. The facts regarding her removal contained in this complaint are for background evidence before this court. Said claim is currently before the MSPB and Plaintiff plans advancing that claim in federal court at a later date.

144.     The Agency's prior justification for its unjust actions against Mrs. Castillo are replete with pretext and an unreasonable refusal to accommodate. Equally, Ms. Lewis actions proved zero concern ever existed for Mrs. Castillo's health and well-being. Therefore, Ms. Lewis explanation for asking Mrs. Castillo to leave her laptop at the office on February 3, 2022, was pretext for discrimination.

145.      The facts in this matter unequivocally establish that Mr. Pascoe's initial refusal to provide Mrs. Castillo with reasonable accommodation of FMLA leave benefits in October 2021 resulted in a severe, albeit avoidable, exacerbation of her symptoms. Had Mrs. Castillo been granted the reasonable accommodation of FMLA benefits at that time, she would not be in the medical condition she currently faces.

146.     Additionally, Mrs. Castillo requested reasonable accommodations on or about April 28, 2022, and continued to persistently request reasonable accommodations from that time period until on or about May 16, 2022.

147.     Had the light-duty job restructuring of marginal duties been provided, Mrs. Castillo would have returned to work and would not be facing this charge of excessive absences.

148.     Throughout the entire process, every Agency Management Official and Agency Representative that Mrs. Castillo encountered shared a singular objective: to protect Mr. Pascoe, a high-ranking management official. They disregarded the violation of Agency policies and the infringement of disability rights—their sole focus was to intensify all actions against Mrs. Castillo to the extent that she would abandon her pursuit of genuine justice. Justice that was denied to her by Agency Representatives during the EEO formal process.

**On June 22, 2023, EEOC Administrative Judge ordered the Agency to issue Final Agency Decision (FAD) within the manner specified in 29 C.F.R. § 1614.110, which is 60 days.**

149.     On or about June 22, 2023, Administrative Judge Kerrie J. Qualtrough issued an order granting Complainant's motion to withdraw hearing request for EEOC Case No. 450-2023-00175X/Agency Case No. USA-2022-000479 and order returning complaint to agency for final agency decision "in the time and manner specified by 29 C.F.R. Sec. 1614.110."

150.     Although the Agency was ordered to release Final Agency Decision (FAD) within 60 days, they did not do so. As a result of the Agency's dilatory inaction, on June 27, 2024, Mrs. Castillo was forced to file an appeal to the Office of Federal Operations to advise the EEOC of the Agency's failure to issue a FAD.

151.     On July 26, 2024, after approximately 400 days of the AJ's order, the Agency finally complied with EEOC Administrative Judge's order and released Mrs. Castillo's FAD. The Agency excessive delay in issuing Mrs. Castillo's FAD was another tactic to discourage Mrs. Castillo from proceeding with her case. In addition, the Agency failed to properly investigate and review Mrs. Castillo's EEO claims.

152.     The Agency's actions not only exacerbated Mrs. Castillo's medical condition but also caused extensive suffering and ruined her ability to provide financially for herself and her family.

153.     All the progress Mrs. Castillo had made to survive past trauma has been completely erased. She has regressed to a state of profound fear, mourning the loss of everything she held dear, including her physical health and prior ability to work.

154.     Mrs. Castillo's youngest children have asked why mommy does not smile much like she used to and her husband must now help her with daily tasks she was once able to do on her own. Also, Mrs. Castillo's oldest son who is a U.S. Navy Sailor on Active Duty wrote a letter expressing his concern

for his mother's health because he is also worried sick about her. Mrs. Castillo's health decline has been a real personal tragic for her and her family.

155. Agency Management Officials all turned a blind eye to what happened to Mrs. Castillo.

156. The Agency refused to grant Mrs. Castillo's request to be removed under medical inability to perform because they denied her status as a qualified person with disability, and indicated in the reasonable accommodation denial form she was just seeking accommodations to not do her job. Well, the U.S. Office of Personnel Management disability retirement operations disagreed with the Agency.

157. Agency Management Officials disregarded the fact that Mrs. Castillo experienced significant discrimination was subjected to unfavorable treatment due to her disability and her need for leave as a reasonable accommodation for mental health treatment. Any other explanation provided by the Agency is pretext for discrimination.

158. On or about August 23, 2023, the U.S. Office of Personnel Management approved Mrs. Castillo's application for disability retirement under Federal Employees Retirement System (FERS) first time up.

159. Mrs. Castillo now seeks justice for the disparate treatment, disability discrimination, hostile work environment, and retaliation she suffered, as well as the exacerbation of her medical condition.

160. Mrs. Castillo incorporates the preceding and proceeding paragraphs into this paragraph by reference. The conduct described above proximately caused actual and compensatory damage to Ms. Castillo, including but not limited to lost wages, benefits, humiliation and emotional distress, physical pain and suffering, medical services and medications in the past and in the future, damage to her personal reputation, damage to her professional reputation, damage to her earning capacity, and damage to her enjoyment of life.

161. It should be noted that the Agency promoted Mr. Pascoe, after Ms. Castillo's wrongful removal, to the position of Administrative Officer, which is a higher-level management position, while he was under investigation for disability discrimination and retaliation against Ms. Castillo.

**COUNT 1**

**REHABILITATION ACT AND ADA/ADAAA -DISABLITY DISCRIMINATION**

162. Plaintiff incorporates the preceding and proceeding paragraphs into this paragraph and Count 1 section by reference.

163. Plaintiff is a member of a protected class under the Americans with Disabilities Act of 1990 (ADA), The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. §12101, *et seq.*, 29 C.F.R. 1614.203(b) 2008, and the Rehabilitation Act of 1973, as amended, at 29 U.S.C. §794 (the "Rehabilitation Act"), 29 U.S.C. §701-7961 (2006).

164. By the conduct described in the preceding and proceeding paragraphs of this complaint, the Agency engaged in unlawful employment practices and discriminated against Plaintiff on account of her disabilities as to the adverse actions including but not limited to: failing to reasonably accommodate Plaintiff; the Agency intentionally delaying giving Plaintiff reasonable accommodations; the Agency intentionally denying Plaintiff the use of her government laptop; the Agency intentionally delaying responding to Plaintiff's requests for assistance with completing the VLTP form, FMLA procedures, reasonable accommodation procedures; the Agency placing Plaintiff in AWOL status; the Agency intentionally providing Plaintiff misinformation; the Agency intentionally ignoring Plaintiff when she consistently requested policy information to understand the adverse actions against her; the Agency intentionally delaying Plaintiff's within grade increase (WGI); the Agency's refusal to review the medical documentation Plaintiff provided to prove her situation was not misconduct; the Agency's refusal to advise if they required additional medical documentation to stop AWOL misconduct charges against Plaintiff and

offer alternate removal without a misconduct charge; the Agency's refusal to see how Ms. Walker's actions were also discriminatory and retaliatory against Plaintiff; the Agency's refusal to address their failure to address Mr. Pascoe's denial and or delay of approving her reasonable accommodation under the FMLA; and treating Plaintiff differently than other similarly situated Agency employees.

165.    The Agency's adverse employment decisions toward Plaintiff were motivated by and/or because of disability-based considerations and protected EEO activity as described in Count II of this complaint.

166.    The Agency's unlawful and discriminatory practices toward Plaintiff were intentional.

167.    The Agency's unlawful and discriminatory practices were done with malice or with reckless indifference for the federal protected rights of Plaintiff.

WHEREFORE, Plaintiff prays the following damages against the Agency:

a.    Grant Plaintiff a permanent injunction enjoining Defendant, it's agents, successors, employees, and those acting in consort with Defendant, from continuing to violate Plaintiff's rights;

b.    Issue an order requiring Defendant to reasonably accommodate Plaintiff and promote Plaintiff to a higher position to which she is entitled by virtue of her responsibilities and qualifications or award front pay if such promotion is not feasible;

c.    Issue an order awarding Plaintiff back pay, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the civil rights violations described above;

d.    Back pay and benefits;

e.    Lost wages;

f. Prejudgment interest and post-judgment interest as allowed by law on back pay and benefits;

g. Front pay and benefits;

h. Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

i. Attorney's fees and costs, including but not limited expert witness fees;

j. Injunctive relief; and

k. For any other relief this Court deems just and equitable.

## COUNT II

## REHABILITATION ACT AND ADA/ADAAA -RETALIATION

168.    Plaintiff incorporates the preceding and proceeding paragraphs into this paragraph and Count II section by reference.

169.    The Rehabilitation Act/ADA/ADAA make it unlawful for an employer to discriminate against any of its employees because the employee has opposed any practice made an unlawful employment practice or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, which includes but are not limited to the Plaintiff's participation in the EEO mediation proceedings during the informal EEO process and the Plaintiff filing a formal EEO complaint.

170.    The Agency retaliated against Plaintiff in violation of Rehabilitation Act/ADA/ADAAA in that Plaintiff's complaints of disability discrimination, disclosing her disabilities, requesting reasonable accommodations and participation in other protected EEO activity was a reason for the Agency taking

adverse actions against Plaintiff that are described in detail in the preceding and proceeding paragraphs, including but not limited to the adverse actions described in Paragraph 164 of this federal complaint.

171.    The Agency also retaliated against Plaintiff by subjecting her to a hostile work environment as described in Count III of this federal complaint.

172.    The retaliatory actions of the Agency occurred shortly in time after the Plaintiff participated in the EEO process, and the explanations for the personnel actions following her participation in the EEO process reflected illegal retaliation in violation of federal civil rights law protecting her activity.

WHEREFORE, Plaintiff prays the following damages against the Agency:

   a.   Grant Plaintiff a permanent injunction enjoining Defendant, it's agents, successors, employees, and those acting in consort with Defendant, from continuing to violate Plaintiff's rights;

   b.   Issue an order requiring Defendant to reasonably accommodate Plaintiff and promote Plaintiff to a higher position to which she is entitled by virtue of her responsibilities and qualifications or award front pay if such promotion is not feasible;

   c.   Issue an order awarding Plaintiff back pay, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the civil rights violations described above;

   d.   Back pay and benefits;

   e.   Lost wages;

   f.   Prejudgment interest and post-judgment interest as allowed by law on back pay and benefits;

   g.   Front pay and benefits;

h.   Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

i.   Attorney's fees and costs, including but not limited expert witness fees;

j.   Injunctive relief; and

k.   For any other relief this Court deems just and equitable.

## COUNT III

## REHABILITATION ACT AND ADA/ADAAA: HOSTILE WORK ENVIRONMENT

173.   Plaintiff incorporates the preceding and proceeding paragraphs into this paragraph and Count III section by reference.

174.   The Rehabilitation Act, ADA and the ADAAA prohibits discrimination against an employee by creating a discriminatory or retaliatory hostile work environment.

175.   A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems*, 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993).

176.   As set forth in the preceding and proceeding paragraphs above, Agency management officials subjected Plaintiff to a discriminatory and retaliatory hostile work environment which included but is not limited to failing to reasonably accommodate Plaintiff; the Agency intentionally delaying giving Plaintiff reasonable accommodations; the Agency intentionally denying Plaintiff the use of her government laptop; the Agency intentionally delaying responding to Plaintiff's requests for assistance with completing the VLTP form, FMLA procedures, reasonable accommodation procedures; the Agency placing Plaintiff in AWOL status; the Agency intentionally providing Plaintiff misinformation; the Agency

intentionally ignoring Plaintiff when she consistently requested policy information to understand the adverse actions against her; the Agency intentionally delaying Plaintiff's within grade increase (WGI); the Agency's refusal to review the medical documentation Plaintiff provided to prove her situation was not misconduct; the Agency's refusal to advise if they required additional medical documentation to stop AWOL misconduct charges against Plaintiff and offer alternate removal without a misconduct charge; the Agency's refusal to see how Ms. Walker's actions were also discriminatory and retaliatory against Plaintiff; the Agency's refusal to address their failure to address Mr. Pascoe's denial and or delay of approving her reasonable accommodation under the FMLA; and treating Plaintiff differently than other similarly situated Agency employees. In furtherance of the hostile work environment the Agency made various denigrating statements and repeatedly demonstrated a lack of professionalism and respect towards Plaintiff. On a daily basis, Plaintiff would have to watch her back, because Agency management officials would constantly try to set her up for failure in order to ultimately justify her termination. On most days, Mr. Pascoe was very hostile and unnecessarily scrutinized Mrs. Castillo's work product. Mr. Pascoe would go behind Ms. Castillo and disparage her to her coworkers and other members of management that caused her extreme harm. This was all very hostile and toxic to Plaintiff because she would constantly stress about whether she would have a job the next day. It became very severe and pervasive for Plaintiff to have to deal with the toxic behavior every single second while working. Plaintiff suffered many headaches, extreme panic attacks, bouts of depression and other trauma while trying to be perfect so as not to do anything that could give the Agency any reason to fire her. The Agency's severe and pervasive hostile actions towards Plaintiff exacerbated her disabilities and caused new disabilities to Plaintiff, including but not limited to Bi-Polar Depression, Migraines, Chronic Fatigue Syndrome, Fibromyalgia, Sleep Apnea, and Insomnia which ultimately led to the Plaintiff being forced to take disability retirement. Plaintiff

would not have had to take disability retirement if the Agency's actions did not cause her disabilities to be exacerbated and caused new disabilities.

177.     The Agency further perpetuated the hostility towards Plaintiff when they constantly refused to accommodate Plaintiff in a timely manner and refused to provide her information to understand the FMLA leave process and reasonable accommodation process. These actions were intended to intimidate, discredit, and silence the Plaintiff.

178.     The Agency's unfounded and repeated hostility towards Plaintiff was motivated by and or because of disability discrimination and in direct retaliation for her protected EEO activity.

179.     The Agency's intentional demeaning and hostile conduct towards Plaintiff was intended to intimidate Plaintiff and were designed to make Plaintiff's work environment hostile and difficult.

180.     The Agency subjected Plaintiff to a severe and pervasive hostile work environment that negatively and effectively changed the terms and conditions of her employment.

181.     The Agency is liable to Plaintiff for the misconduct of its employees working at the Agency USAO-SDTX Office.

182.     Plaintiff has suffered damages as a result of the hostile work environment created by the Agency, including past and future lost wages and benefits, and the costs of bringing this action.

WHEREFORE, Plaintiff prays the following damages against the Agency:

a.  Grant Plaintiff a permanent injunction enjoining Defendant, it's agents, successors, employees, and those acting in consort with Defendant, from continuing to violate Plaintiff's rights;

b.  Issue an order requiring Defendant to reasonably accommodate Plaintiff and promote Plaintiff to a higher position to which she is entitled by virtue of her responsibilities and qualifications or award front pay if such promotion is not feasible;

c.  Issue an order awarding Plaintiff back pay, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the civil rights violations described above;

d.  Back pay and benefits;

e.  Lost wages;

f.  Prejudgment interest and post-judgment interest as allowed by law on back pay and benefits;

g.  Front pay and benefits;

h.  Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

i.  Attorney's fees and costs, including but not limited expert witness fees;

j.  Injunctive relief; and

k.  For any other relief this Court deems just and equitable.

Dated this 21st day of October 2024

Respectfully submitted,

/S/ Ashok Bail

_____

Ashok Bail
Attorney for Plaintiff
3120 Southwest Freeway, Suite 450
Houston, TX 77098
Tel. No. (832) 216-6693
Fax. No. (832) 263-0616
E-mail: ashok@baillawfirm.com
Attorney for Plaintiff
The Bail Law Firm, PLLC